**SOUTHERN SURETY CO. v. BRALEY et al.**

No. 9488.

Circuit Court of Appeals, Eighth Circuit.

April 26, 1933.

David A. Murphy, of Kansas City, Mo. (John T. Harding and R. Carter Tucker, both of Kansas City, Mo., on the brief), for appellant.

Blatchford Downing, of Kansas City, Mo. (Henry L. McCune, Robert B. Caldwell, and J. M. McCune, all of Kansas City, Mo., on the brief), for appellees.

Before STONE, VAN VALKEN-BURGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is a suit in equity brought by Bertha L. Braley and Dorothy L. Braley to recover a balance alleged to be due upon a bond given to secure the performance of a lease. Appellant was surety on the bond.

The suit was commenced in the state court of Missouri, and was duly transferred to the federal court on the ground of diversity of citizenship, and the requisite jurisdictional amount involved. It was commenced as an action at law, but by amended pleadings was converted into a suit in equity and transferred to the equity side of the court.

From a decree ordering judgment in favor of the plaintiffs in the amount of $14,942.16, defendant appeals.

The salient facts are substantially as follows: On or about December 17, 1924, plaintiffs executed a 99-year lease to L. Newton Wylder, covering two lots in the business district in Kansas City, Mo. Said lease provided for an annual rental of $25,000 for the first 10 years, with an increased rental thereafter. The rent was payable, after the first year, in quarterly installments in advance. In addition to the cash rental, the lease obligated the lessee to promptly pay all taxes on said property. The lease also required the lessee to give a $50,000 bond to the lessors to secure the performance of the covenants of the lease. It further provided: "No assignment of this lease shall be made by lessee unless at the time of such assignment all rents, assessments, liens, insurance premiums and other charges of every kind which lessee may be liable for under this lease shall be fully paid and all covenants and agreements on the part of lessee in this lease shall be fully kept and performed up to the date of such assignment. No assignment made by lessee prior to the erection of a new building on demised premises shall release and discharge lessee from any of his obligations hereunder."

The lease further provided that no assignment should in any way discharge the lessee from his obligations under said lease until said assignment had been recorded and a certified copy thereof delivered to the lessors; and that no assignment should release the lessee which did not fully bind the assignee to perform each and all of the obligations of the original lessee.

In accordance with the provisions of said lease, Wylder as principal, and the defendant, Southern Surety Company, as surety, executed a bond in the amount of $50,000 which was to run for 5 years from the date of the lease, unless within that time the lessee or his assigns should have erected a building on said premises costing not less than $150,000. No building was ever erected by the lessee. Said bond further provided that, in case of default under the lease, "the surety shall have the right to remove the ground of such default or defaults and in that event the surety shall become subrogated to all the rights of said lessee under said lease and shall at its option become substituted as lessee in said lease." The bond was conditioned as follows: "The condition of this obligation is such that if the said bounden Principal shall in all things well and truly perform all the terms and conditions of the Ninety-nine (99) year lease, copy of which is hereto attached and made a part hereof, and marked 'Exhibit,' which said conditions are by him to be performed, and within the time therein mentioned, and shall save the said lessors, Bertha L. Braley and Dorothy L. Braley, harmless from any and all liability as provided in said lease, and shall pay the rent therein reserved and the taxes, for a period of five (5) years from the date of said lease, unless within five

(5) years the said lessee or his assigns shall have erected a new building on said premises costing not less than One Hundred Fifty Thousand ($150,000.00) Dollars, with basement and walls sufficient to contain a six story building, all as provided in this lease, then this obligation shall be null and void, otherwise to remain in full force and effect."

In order to obtain said bond, Wylder agreed to indemnify the surety company against all claims, liabilities, and expenses arising thereunder; and he also executed a bond to the surety company to that effect, the sureties on this latter bond being W. S. Marrs (Wylder's father-in-law) and the Kupper-Benson Hotel Company, of which Marrs was the president and Wylder the secretary.

To further protect the surety company from loss under its $50,000 bond, Wylder caused to be deposited with said company under a collateral receipt certain securities belonging to W. S. Marrs. This receipt provided, among other things, that the surety company might sell said collateral to reimburse it for any damages or losses sustained under said bond; and that the surety company would not be liable for depreciation of any of the collateral.

On December 27, 1924, Wylder executed an assignment of the lease to the Kupper-Benson Hotel Company, and that company went into possession of said premises, collected the rents, and paid the rentals due to the lessors until October 1, 1927.

On December 30, 1926, the Kupper-Benson Hotel Company and Wylder assigned the lease to defendant "as collateral security to protect and indemnify said Southern Surety Company," by reason of its having become surety on said $50,000 bond. It was agreed in said assignment that, if Wylder or the Kupper-Benson Hotel Company should perform the covenants under the lease and save the surety company harmless from any loss on said bond, the assignment should be void; otherwise that it should remain in full force and effect.

Neither of the assignments of the lease was recorded as required under the provisions of the lease; and plaintiffs had no notice thereof, except whatever might be implied from the receipt of the hotel company's checks by plaintiffs. Mr. Wylder testified that the plaintiffs did not want to make a lease executed in the name of a hotel, and therefore the lease was taken in his name; that he did not notify the Braleys about the assignment to the hotel company, but they found it out about a year or two later; that he never obtained the consent of the plaintiffs to said assignment.

On December 30, 1926, the date when the lease was assigned to defendant, Wylder wrote to defendant asking it to wire Mr. McCune, attorney for plaintiffs, that defendant would pay the 1925 and 1926 delinquent taxes on or before January 5, 1927. Defendant telegraphed Wylder in answer to his letter as follows: "Will wire McCune when advised by McCune that he will credit amount we advanced on bond liability. No notice served on Southern."

Mr. McCune was advised of the contents of this telegram.

On January 5 and 10, 1927, respectively, defendant paid the city and county taxes on the leased property.

When the April 1, 1927, quarterly installment of rent became due, it was agreed between plaintiffs and Wylder that it might be paid as follows: $2,250 on April 1st; $2,000 on May 1st; and $2,000 on June 1. To this agreement defendant consented at the request of plaintiffs' attorney. The Kupper-Benson Hotel Company then paid both the $2,250 and the $2,000 installments for April and May, but did not pay the $2,000 due on June 1st. Another quarterly installment became due July 1st.

Plaintiffs agreed, in a letter written to defendant by their attorney on July 26, 1927, to accept these two installments of rent and all future payments due from the defendant in monthly installments, provided 8 per cent. interest on all deferred installments were paid by Mr. Wylder. The letter further stated: "Any and all payments made by you in accordance with this letter for rentals due and payable under the above lease will apply on the bond above described and your liability therein will be reduced to the amount of the aggregate of said payments. Your liability, of course, will not be reduced to the extent of any interest paid by Mr. Wylder."

This letter was written prior to the date when defendant took over possession, control, and management of the leased premises, and must be construed accordingly.

On or before September 13, 1927, defendant had paid out of its own funds to plaintiffs, or in taxes, the aggregate sum of $17,115.69.

Prior to October 1, 1927, Mr. Marrs died, and Wylder took charge of the premises as trustee, and for the month of October collected the rentals and deposited them in a trust account.

On November 1, 1927, defendant notified Wylder that it would have to take charge of the premises; and on November 8th defendant went into possession, and thereafter collected the rents, paid the operating expenses, and retained the difference of $12,111.45 in reimbursement of its loss under the bond. This change of possession was without the knowledge or consent of plaintiffs.

From September 13, 1927, to July 6, 1928, defendant paid out to the plaintiffs and in taxes the total sum of $32,337.43, which amount, added to the sum of $17,115.69 paid out before September 13th, aggregated $49,-453.12. It was recited in the drafts by which some of said payments were made that they were being paid "under the bond."

After defendant entered possession of said premises, plaintiffs requested it several times to furnish a statement covering disbursements made under the bond, but defendant did not comply with these requests. However, defendant claims that, whenever it paid taxes on the premises, it exhibited the tax receipts to plaintiffs' attorney.

On October 2, 1928, defendant tendered to plaintiffs the sum of $546.88, the balance which defendant alleged was due under the $50,000 bond. The tender of this amount was refused by plaintiffs. Defendant still retained the $12,111.45 collected as rentals from said property.

On April 4, 1928, defendant sold ten shares of Mutual Bank stock, which were among the collateral securities deposited with it by Wylder, for which it obtained $1,050. It applied this amount on its loss under the bond. It alleged that the balance of the securities were without value.

On September 7, 1928, plaintiffs served a 60-day written notice of forfeiture of the lease on Wylder based upon the provision of the lease reading as follows: "Lessee shall at all times during the term of this lease (except as hereinafter provided) keep on deposit with lessors or with some bank, banking institution or trust company, to be designated by lessors or either of them, a Bond in the penal sum of Fifty Thousand ($50,000.00) Dollars with surety or sureties satisfactory to lessors or securities satisfactory to lessors of the value of Fifty Thousand ($50,000.00) Dollars, to secure the performance by lessee of all his covenants or agreements in this lease."

By mutual agreement, the possession of the leased premises was not taken over by plaintiffs until March 1, 1929. They thereafter continued in possession of said premises, collecting the rents and paying the taxes and other expenses; but they received $22,924 less than they would have received during the first 5-year period of said lease, if the lessee had performed all of the covenants thereof.

The question presented to the trial court was whether defendant was entitled to retain the $12,111.45 collected by it as net rentals while it was in possession of the leased premises, and apply the same toward the loss it had sustained under the bond; or whether this amount should have been turned over to the plaintiffs, for rent due on October 1, 1928, and January 1, 1929.

The court made findings and conclusions of law, and entered its decree in favor of plaintiffs in the sum of $14,942.

We think the action of the trial court was right. Any property which the debtor might place in the hands of the surety constituted a fund to which the surety could resort for indemnity, only after the creditor had been paid in full. Some authorities hold that such a fund is a trust fund for the benefit of the creditor. Whether it has that technical character, we need not decide. Suffice it to say the surety cannot participate in stripping the debtor of his property and apply the fund so obtained to indemnify itself for loss sustained on its bond, leaving the creditor unpaid. Equity will not permit such a result. The rule is well and broadly stated in Receivers of New Jersey Midland Railway Co. v. Wortendyke, 27 N. J. Eq. 658, 661, as follows: "The right of subrogation cannot be enforced until the whole debt is paid; and until the creditor be wholly satisfied, there ought and can be no interference with his rights or his securities, which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim."

And the rule is well established in the federal courts. Chamberlain v. St. Paul, etc., R. Co., 92 U. S. 299, 23 L. Ed. 715; Hampton v. Phipps, 108 U. S. 260, 2 S. Ct. 622, 27 L. Ed. 719; United States v. National Surety Co., 254 U. S. 73, 41 S. Ct. 29, 65 L. Ed. 143; Jenkins v. National Surety Co., 277 U. S. 258, 48 S. Ct. 445, 72 L. Ed. 874; Maryland Casualty Co. v. Fouts (C. C. A.) 11 F.(2d) 71, 46 A. L. R. 852; Swift & Co. v. Kortrecht (C. C. A.) 112 F. 709; National Surety Company v. Salt Lake County, 5 F.(2d) 34 (C. C. A. 8). In the case last cited, the rule stated by the New Jersey court is quoted with approval.

It is true that in the Jenkins Case the debtor was insolvent, but we think the principle

announced in that case and in the other authorities cited is applicable to the case at bar, in which it is stipulated that the debtor is financially unable to pay his creditors, the plaintiffs.

The Jenkins Case also disposes of the contention that there is a distinction where the surety takes from the debtor a separate indemnity agreement.

The decree is affirmed.